IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVOUD ROUEI, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 12 C 6622 |
| VILLAGE OF SKOKIE and JEFFREY GROBERSKI, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Davoud Rouei[1] has sued Skokie police officer Jeffrey Groberski pursuant to 42 U.S.C. § 1983 for violations of the Fourth Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Rouei also asserts his equal protection claim against the Village of Skokie, and he makes a claim against Skokie for indemnification of Groberski, pursuant to 745 ILCS 10/9-102. Defendants have moved for summary judgment on all of Rouei's claims.

### Background

When considering a motion for summary judgment, the Court "constru[es] all facts and reasonable inferences in the light most favorable to the [non-moving party]." *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2001).

---

[1] The spelling of plaintiff's name varies in the materials that have been submitted to the Court. For instance, the complaint refers to "Dovoud," but plaintiff's opening brief refers to "Davoud". Because Rouei's deposition testimony reads "Davoud," the Court adopts this spelling of his name. Pls.' Ex. A at 1.

Rouei is an Iranian-American. On August 18, 2010, at approximately 7 p.m., Groberski conducted a traffic stop of Rouei's vehicle. The stop lasted approximately thirty minutes. Groberski says that he stopped Rouei because it appeared that Rouei was driving without a seatbelt in violation of Illinois law. Groberski bases this on what he says he could see from the side of Rouei's car. Groberski also says that Rouei made a motion as Groberski approached the car, which he says suggested that Rouei was putting on his seatbelt.

Rouei disputes Groberski's contention that he had any basis to believe that he was not wearing a seatbelt. Rouei argues that Groberski could not have seen whether he was wearing his seatbelt, as Groberski was behind Rouei's car, and the car's windows were tinted. Rouei also contends that other evidence shows that he actually was wearing a seatbelt and that Groberski had no legitimate basis to stop him. Finally, Rouei contends that Groberski was motivated by racial or ethnic bias and that Skokie police officers routinely stop drivers on the basis of racial animus.

The traffic stop and its aftermath were recorded both by a camera in Groberski's police car and by a video camera that Rouei had installed inside his car after what he contends was previous harassment by Skokie police officers. The videos, which also include audio recordings of the events, reflect that after approaching Rouei's car, Groberski repeatedly asked him for his driver's license and proof of insurance. Rouei did not respond directly and did not provide these items; rather, he repeatedly asked why Groberski had stopped him, said Groberski had no legitimate basis for the stop, and asked Groberski to call his supervisor to the scene. Groberski would not say why he had stopped Rouei and told Rouei that he would tell him this only after Rouei

2

provided his license and proof of insurance. Rouei became increasingly agitated as the encounter continued.

After fifteen minutes or more passed and another officer arrived on the scene, Groberski ordered Rouei out of his car, saying that he was going to place Rouei under arrest for not "following a lawful order" to produce his license and proof of insurance. Rouei complied, and Groberski handcuffed Rouei and placed him under arrest. Groberski told Rouei, ""Okay, step out of the vehicle" Rouei replied, "Fine, fine, I have my seat--," and Groberski or the other officer said, "Undo your seatbelt and step out." Rouei complied, saying "I'm coming out, I'm coming out."

Once Rouei had gotten out of the car, Groberski handcuffed Rouei and placed him under arrest. Rouei was transported to the police station, where Groberski issued him citations for failing to wear a seatbelt, refusing to provide his license on demand, and refusing to provide proof of insurance on demand. Pl.'s Ex. A at C005-C006. In addition, Groberski signed a misdemeanor complaint charging Rouei with obstructing a police officer. Defs.' Ex. I at C004.

Rouei says that at the station, Groberski stated he had run Rouei's license plate prior to the traffic stop, see Pl.'s Ex. C ¶ 10, and thus, Rouei says, Groberski had learned Rouei's Iranian name at that time. Rouei also claims that Groberski made several racially offensive comments at the station, including that Rouei "wasn't hairy like a Middle Eastern" while he was searching him; "that nigger is going to get screwed," in reference to a black male being escorted out in handcuffs; and that Rouei was a "terrorist." Id. ¶¶ 7, 9, 11.

After a bench trial, Rouei was found guilty of obstructing a police officer and not

3

guilty of failing to wear a seatbelt and failing to produce his driver's license. The citation for failing to provide proof of insurance was dismissed before trial.

The trial judge's guilty finding on the obstruction charge was reversed on appeal on July 23, 2013. Pl.'s Ex. E. The Court summarizes the appellate court's ruling not because it is necessarily admissible in evidence (the Court need not decide that issue at this point), but for purposes of background and context. The appellate court, which had reviewed the video evidence, ruled that "the record reveals with certainty that [Rouei] was wearing his seatbelt at the time [Groberski] approached the vehicle and communicated with him." *Id.* at 3. The court said that once Groberski realized this, "any reasonable suspicion of criminal activity dissipated," and he should have terminated the stop. *Id.* The court concluded that Groberski "impermissibly prolonged the stop" by asking Rouei for his license and insurance and failing to tell Rouei the reason for the stop. *Id.* at 3-4. For this reason, the court concluded, the request was unauthorized and could not be the basis for a conviction for obstructing a police officer. *Id.* at 4. The court also noted that based on Rouei's video recording, at no point during the stop did Rouei pull his seatbelt over his shoulder; "[i]n fact, the video shows that [Rouei] put on his seatbelt at the beginning of his ride in the vehicle." *Id.*

Rouei filed this suit in August 2012. As indicated earlier, defendants have moved for summary judgment. For the reasons stated below, the Court grants summary judgment in favor of Skokie on Rouei's section 1983 claim against the village but otherwise denies defendants' motion.

## Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine

4

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A material fact is one identified by the substantive law as affecting the outcome of the suit. . . .  A genuine issue exists with respect to any such material fact, and summary judgment is therefore inappropriate, when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Hanover Ins. Co. v. N. Bldg. Co.*, 758 F.3d 788, 791 (7th Cir. 2014) (internal quotation marks and citations omitted).

**A.    Fourth Amendment claim**

Rouei contends that Groberski violated the Fourth Amendment's prohibition on unreasonable seizure "when he pulled over [Rouei] without probable cause or reasonable suspicion."[2]  Compl. ¶ 35.  "An officer's temporary detention of an individual during a traffic stop constitutes a seizure of a person . . . and thus must be reasonable under the circumstances."  *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014).  A traffic stop is reasonable when an officer has a "reasonable articulable suspicion that criminal activity is afoot," including an "observed violation of traffic law."  *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007); *Huff*, 744 F.3d at 1004.  "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *United States* v. *Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).  Assessment of whether reasonable suspicion exists is an objective inquiry requiring consideration of "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect."  *Riley*,

---

[2] The Court will address only the issue of reasonable suspicion because it is a lower threshold of suspicion than probable cause and thus makes it correspondingly more difficult for Rouei to sustain his claim.

5

493 F.3d at 808.

Defendants maintain that Rouei has failed to provide evidence from which a reasonable jury could find that Groberski lacked reasonable suspicion that Rouei was driving without a seatbelt. Defendants' argument, however, essentially boils down to the proposition that because no one can directly refute Groberski's claim regarding what he saw at the time, a jury essentially has to take his word for it. That is not a viable argument even if taken on its own terms. That aside, however, Rouei has offered other evidence from which a reasonable jury could find that reasonable suspicion was lacking. This includes testimony that the windows of his car were tinted and that the angle from which Groberski observed Rouei prior to the stop (largely from behind) would not have permitted Groberski to see whether Rouei's seatbelt was fastened. From this evidence, a reasonable jury could find that Groberski lacked reasonable suspicion that Rouei was not wearing a seatbelt.

Defendants state that "it is undisputed that it was possible to see through [Rouei's] windows, as shown by . . . photographs." Defs.' Reply at 9. In support, defendants cite photographs of the car taken by a private investigator in 2013. The private investigator has supplied a sworn affidavit stating that the new owner of the car told him that "he had not replaced the rear or passenger side windows in the vehicle after he purchased it." Defs.' Ex. G ¶ 4. The purported statement by the new owner contained in the investigator's affidavit is inadmissible hearsay. With defendants' reply, however, they submitted an affidavit from Groberski that lays the foundation for the photos' admissibility. But although the photos can be claimed to support Groberski's position, they do not conclusively establish that his contention about what he could see

6

and did see is accurate. A reasonable jury could find, based on Groberski's angle of view alone, that he had no opportunity to see what he claims to have seen.

The Court also notes the existence of Rouei's video recording, which shows that he fastened his seatbelt at the start of his drive and did not unfasten it, as well as the audio recording of Rouei and Groberski's exchange, during which Groberski asked Rouei to "[u]ndo [his] seatbelt and step out." Though this evidence does not conclusively prove that Groberski had no basis for reasonable suspicion that Rouei was not wearing his seatbelt, it supports Rouei's contention that reasonable suspicion was lacking. The same recordings are also indicative of what a reasonable jury could find regarding what an officer situated where Groberski was could have observed immediately before and during the traffic stop; a reasonable jury could find they support Rouei's contention in this regard. This, too, contributes to the proposition that a reasonable jury could find in Rouei's favor. *See, e.g., Bogan v. City of Chicago*, 644 F.3d 563, 571-72 (7th Cir. 2012) (evidence regarding what officer observed and deductions he made relevant in assessing whether his actions were objectively reasonable under the circumstances). Finally, a jury reasonably could infer from Groberski's repeated refusal to answer Rouei's question about why Groberski had pulled him over that the officer actually had no information that would give rise to reasonable suspicion.

Rouei also contends that even if Groberski appropriately stopped him, he unduly prolonged the seizure, making it unreasonable. "[A] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543

U.S. 405, 407 (2005). Given the Court's conclusion that Rouei's claim that there was no proper basis for the stop survives summary judgment, the Court need not address at this juncture the issue of the prolongation of the stop. The Court will do so, however, to avoid the need to revisit the point as the case proceeds.

Rouei bases his contention regarding the length and scope of the stop partly on the Illinois appellate court's conclusion that because "Groberski impermissibly prolonged the stop by asking [Rouei] for his driver's license and insurance, and not informing defendant of the reason for the stop." Pl.'s Ex. E ¶ 10. The conclusion is not claim or issue-preclusive in this lawsuit, because neither Groberski nor Skokie was a party to the criminal case or in privity with a party, a requirement for both claim and issue preclusion under Illinois law, which governs the preclusive effect of the state court ruling. *See, e.g., Kraushaar v. Flanigan*, 45 F.3d 1040, 1051 (7th Cir. 1995); *Delgadillo v. Paulnitsky*, No. 05 C 3448, 2007 WL 1655252, at *3-4 (N.D. Ill. June 1, 2007).[3]

Even without the appellate court's opinion, however, a reasonable jury could find that Groberski's traffic stop of Rouei became unreasonable almost immediately, even if it was reasonable in the first instance. As indicated earlier, the claimed basis for the stop was the contention that Rouei was not wearing his seatbelt. A reasonable jury could find that as he approached the car, Groberski easily could observe that Rouei's seatbelt was fastened and had been. Confirmation of that fact, a reasonable jury could find, "complete[d] [the] mission," *Caballes*, 543 U.S. at 407, thus requiring Groberski to end the stop without further ado and allow Rouei to proceed on his way. The same reasonable jury could find that Groberski's further requests to Rouei to produce

---

[3] The Court need not determine at this point whether the appellate court's findings are admissible in evidence even though they are not issue- or claim-preclusive.

information were unwarranted and amounted to an unreasonable prolongation of the stop beyond its appropriate scope.[4]

**B.     Due process claim**

Rouei also contends that the defendants violated the Constitution's Due Process Clause by fabricating evidence against him, which was then used to charge him. Compl. ¶¶ 30-31.  Defendants seek summary judgment on this claim as well. Their argument in their opening brief, in its entirety, is as follows:

> There is no evidence in the record that defendants falsified any evidence. Plaintiff's videotape shows that plaintiff repeatedly refused to furnish his driver's license and insurance information.  Facts, ¶ 24.  The videotape and transcript show that plaintiff refused to comply with Officer Groberski's lawful commands despite repeated requests.  Facts, ¶ 24.

Defs.' Mem. in Support of Motion for Summ. J. at 10.  This reflects a misunderstanding of Rouei's due process claim.  Rouei's response brief makes it clear that the evidence he contends is fabricated is Groberski's statement that he saw Rouei without his seatbelt.  Pl.'s Mem. at Opp. to Defs.' Mot. for Summ. J. at 4, 6.  Although Rouei also disputes that he "refused" to provide his driver's license and insurance information, *see id.* at 5-6, that is not the thrust of his due process claim:  the claim focuses on the alleged false statement by Groberski, used as the basis for one of the charges against Rouei, that he was not wearing his seatbelt.  Defendants do not deal with this point in discussing the due process claim either in their opening brief or in their reply.

For the reasons discussed in connection with Rouei's Fourth Amendment claim,

---

[4] Although the Court has concluded that the state appellate court's determinations regarding the stop are not preclusive against Groberski or Skokie, the fact that appellate justices found, on the same record, that the stop was inappropriately prolonged provides some logical support for the proposition that a reasonable jury could also so find.

9

a reasonable jury could find that Groberski was unable to see whether Rouei had his seatbelt fastened and thus that his statement to the contrary was knowingly falsified. Thus on the due process claim, a reasonable jury could find in Rouei's favor with regard to the seatbelt charge, whether or not there is a basis for a falsification-of-evidence claim on the other charges. Defendants do not contend in their motion that one untainted charge eliminates the possibility of a due process-based suit on other charges brought concurrently, and thus they have forfeited that point for summary judgment purposes.

## C. Equal protection claim

Rouei also claims that Groberski and Skokie violated his rights under the Equal Protection Clause. He contends that Groberski in essence "profiled" him based on his Iranian (or Middle Eastern) origin. Rouei also asserts this claim against Skokie. He contends that Skokie police officers routinely racially profile drivers, conducting unwarranted traffic stops of minorities, but not whites. Compl. ¶ 26. The Court first assesses Rouei's claim against Groberski and then considers his claim against Skokie.

### 1. Claim against Groberski

To prevail on his equal protection claim, Rouei must show that defendants' conduct "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Hayes*, 236 F.3d 891, 895 (7th Cir. 2001) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Rouei argues that Groberski stopped and arrested him and caused him to be charged out of racial or ethnic animus. He has offered evidence that, if believed by a jury, would permit a finding in his favor.

Evidence of ethnic bias by a decision maker is admissible to prove his

discriminatory intent, and Rouei has offered such evidence. First, Rouei states in an affidavit that Groberski said that he had run Rouei's license plate prior to the traffic stop. *See* Pl.'s Ex. C (Rouei Affid.) ¶ 10. This would have enabled Groberski to learn that the person he was thinking about stopping was named "Davoud Rouei" and thus arguably would have clued Groberski in to the fact that Rouei was a member of an ethnic minority group.

Second, in the same affidavit, Rouei states that Groberski made several comments following the arrest that reflected biased or bigoted ethnic and racial views, including that Rouei "wasn't hairy like a Middle Eastern" as he was searching him; that Rouei was a "terrorist"; and the statement "that nigger is going to get screwed," in reference to a black male being escorted out in handcuffs at the police station, Pl.'s Ex. C ¶¶ 7, 9, 11. "[Racially derogatory] language is strong evidence of racial animus, an essential element of any equal protection claim." *DeWalt v. Carter*, 224 F.3d 607, 612, n. 3 (7th Cir. 2000). These statements are sufficiently contemporaneous with the events at issue to be relevant and admissible.

Defendants ask the Court to disregard Rouei's affidavit, citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 598 (7th Cir. 2003), and *Buie v. Quad Graphics, Inc.* 366 F.3d 496, 504 (7th Cir. 2004), for the proposition that "[s]elf-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." Defs.' Reply at 14 (internal quotation marks omitted). However, defendants ignore, and do not even bother to acknowledge, controlling precedent that an affidavit (like Rouei's) that is based on personal knowledge and sets forth specific facts is sufficient to show a genuine factual dispute for summary judgment purposes. *Hill v. Tangherlini*, 724 F.3d

965, 967-68 (7th Cir. 2013) (overruling *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001), on which both *Palmer*, 327 F.3d at 596, and *Buie*, 366 F.3d at 504, rely).[5] "As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.* at 967. It is up to a jury to decide whether to believe Rouei's claims about what Groberski said, not for this Court to decide to make that determination at a threshold level and exclude the evidence.

Rouei's evidence that Groberski had no appropriate basis for the stop, as discussed earlier, also supports his equal protection claim. To put it in a nutshell, Rouei has offered evidence that, if believed by a jury, would establish that Groberski, knowing that Rouei was a member of an ethnic minority and lacking any legitimate basis to stop his vehicle, nonetheless did so and then made ethnically and racially biased statements in connection with the resulting arrest. (A jury might not believe Rouei's testimony about what Groberski said, but it reasonably could do so.) This evidence would permit a reasonable jury to conclude that Groberski harbored racial or ethnic animus and stopped and caused Rouei to be charged because of it. This is sufficient to permit a reasonable jury to find in Rouei's favor on his equal protection claim against Groberski.[6]

Rouei has not offered direct evidence that Groberski refrained from stopping or

---

[5] The Court notes that applicable professional standards require an attorney to disclose legal authority in the controlling jurisdiction that is directly adverse to his client's position—which is the case here with regard to defendants' attorney's reliance on the argument about "self-serving" statements by an opposing party. *See* Ill. R. Prof. Conduct 3.3(a)(2); Am. Bar Ass'n Model R. Prof. Conduct 3.3(a)(2).

[6] For this reason, the Court need not address Rouei's alternative "class-of-one" theory supporting his equal protection claim.

12

harassing similarly situated persons. But a claim like this one that involves direct evidence of racial or ethnic animus is inherently suggestive of differential treatment. And as the Seventh Circuit indicated in addressing a class-of-one equal protection claim, "in a straightforward official harassment case like the allegations here, forcing the plaintiff to name a person not so severely harassed serves no . . . purpose." *Geinosky v. City of Chicago*, 675 F.3d 743, 746 (7th Cir. 2012).

For these reasons, Groberski is not entitled to summary judgment on Rouei's equal protection claim.

### 2. Claim against Skokie

By contrast, Rouei has failed to offer evidence from which a reasonable jury could find in his favor on his section 1983 claim against Skokie. "Local governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). "Although not authorized by written law . . . practices of state officials could be so permanent and well-settled as to constitute a custom or usage with the force of law." *Id.* at 691 (internal quotation marks omitted). Rouei's evidence in support of his section 1983 claim against Skokie consists of statistics that he contends show a pattern of targeting minorities for traffic stops and testimony and other evidence involving prior encounters that Rouei had with other Skokie police officers.

If a plaintiff attempts to prove an equal protection case with statistics, the "statistics proffered must address the crucial question of whether one class is being

treated differently from another class that is otherwise similarly situated." *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001).  In *Hunter v. Underwood*, 471 U.S. 222, 227 (1985), the Court concluded that evidence that black people were 1.7 times as likely as white people to be disenfranchised by a particular law met this requirement.  In *Armstrong*, however, the Court found that an affidavit showing that all twenty-four cases handled by the public defender's office in 1991 involved black people failed to demonstrate selective prosecution, because it did not "identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Armstrong*, 517 U.S. at 470.  In other words, the evidence in *Armstrong* fell short as statistical evidence of discrimination, because it did not provide a basis for comparison between those allegedly discriminated against and others similarly situated.

Rouei's statistical evidence is a report of a traffic stop study prepared by the University of Illinois for the Illinois Department of Transportation (IDOT).  The report indicates that in 2010, Skokie officers made a total of 9,771 stops of white drivers and 5,047 stops of minority drivers, meaning 65.94% of their stops involved white drivers and 34.06% of their stops involved minority drivers.  Pl.'s Ex. D at 19.  The report also calculates the ratio between the percentage of minority stops and the "estimated minority driving population" in 2010.  As Rouei points out, the resulting ratio—1.14— reflects that Skokie police officers stopped minorities 10% more frequently than one would expect based on the number of minorities estimated to be on the road.  *Id*.; Pl.'s Resp. Br. at 13.

As comparative evidence, the ratio in the study is only as good as the "estimate"

14

of minority driving population in the particular municipality. If that figure is underestimated, the purported greater frequency of minority stops is overstated. Rouei has offered nothing that attempts to explain or justify the study's minority-driver estimate as it relates to Skokie. Rather, he offers only a copy of the report from the website where it is posted. When the report describes this estimated figure, it does so generally and not with reference to any particular municipality. *See* Pl.'s Ex. D, numbered page 5. As support for the estimate, the report says in a footnote that "[f]or a detailed description of the construction of the estimated driving population see the 2004 Annual Report available from IDOT." *Id.* at 5 n.4. Rouei has not, however, provided that information, nor has he attempted to explain why an estimate that apparently was derived from *2004* information is appropriately used to make a comparison involving *2010* traffic stops.

In addition, as defendants point out, one cannot say from what Rouei has submitted whether or how a person of Iranian descent would have been categorized by the study. The study appears to compare only the following racial and ethnic categories of persons: Caucasian; African American; American Indian; Hispanic; and Asian (and there is no definition of "Asian" provided within what Rouei has produced). There is no evidence indicating how the study's authors categorized persons whose national origin is from a Middle Eastern country.

The Court concludes that the study contributes nothing of evidentiary value to Rouei's claim against Skokie. Indeed, on the present record at least, it is difficult to see how the study would even be admissible, given the absence of a proper evidentiary foundation. For this reason, the Court need not address defendants' contention that Rouei should not be able to rely on the study because he did not produce or cite it

during the course of discovery.

In addition to the University of Illinois study, Rouei relies on what he characterizes as "consistent harassment by different Skokie officers, in different places, without reprimand is evidence of a policy aimed at plaintiff." Pl.'s Resp. Br. at 15. Rouei testified about past encounters with Skokie police officers, two of which are notable. In 2006, an officer allegedly took pictures of Rouei speaking with an Iranian-American woman at a grocery store, followed him home, and yelled, "you stay away from that girl, you still live with your parents, you stick with Jewish men." Pl.'s Ex. A at 69, 149-154. Rouei testified that one of the officers involved in the 2006 incident, along with another Skokie officer, stopped him as he was walking down the street in 2008 and asked him for identification. *Id.* at 140. Rouei testified that they viewed his identification and then gestured to each other as if something smelled. *Id.*

With regard to his *Monell* claim against Skokie, Rouei contends that this evidence tends to show that Skokie has a custom of ignoring, and hence sanctioning, a pattern among Skokie officers of stopping and harassing minorities without a proper basis and out of racial animus. The Seventh Circuit has acknowledged "that § 1983 c[an] be imposed on a municipal unit of government based on a custom or policy of 'inaction'" if plaintiff shows:

> (1) the existence of a clear and persistent pattern of discrimination by municipal employees; (2) notice or constructive notice on the part of the City; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011).

Defendants contend that Rouei has failed to offer evidence from which a

reasonable jury could find a custom or practice of misconduct. Rouei cites the "[t]he *Phelan* Court" for the proposition that the law does "not foreclose a plaintiff from demonstrating a widespread and well-settled practice based solely on his own experience where he can demonstrate that repeated actions directed at him truly evince the existence of a policy." Pl.'s Resp. Br. at 15 (internal quotation marks omitted. This is a reference to *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2011). In *Phelan*, the court said that "if the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Id* (internal quotations marks omitted). But there are two problems with Rouei's evidence. First, he offers no evidence of "acquiescence" by Skokie, or even evidence that he complained about the prior incidents. Second, he does not offer evidence of enough incidents to permit a reasonable jury to draw an inference of a custom or practice. Although the Seventh Circuit has "not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014).[7] *See, e.g., Estate of Moreland v. Dieter,* 395 F.3d 747, 760 (7th Cir.2005) (rejecting evidence that prison guards had improperly pepper sprayed inmates on at least three occasions as proof of a practice to which the sheriff was indifferent. Rouei's testimony about two possible racially-motivated incidents with

---

[7] This statement by the Seventh Circuit cannot be taken literally, given the Supreme Court's statement that it has "not foreclose[d] the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (citing *Canton v. Harris*, 489 U.S. 378, 390 & n.10) (1989). In this case, however, Rouei has offered no evidence of any such failure to train.

Skokie officers in 2006 and 2008 falls short of evidence from which a reasonable jury could find a pattern to which Skokie has turned a blind eye.

For these reasons, the Court holds that no reasonable jury could conclude that Rouei has made out a *Monell* claim and therefore grants summary judgment in the Village of Skokie's favor on that claim.

**D.     Qualified immunity**

Defendants contend that Groberski is entitled to qualified immunity, though their briefs confine their argument on this point to the matter of liability for violating the Fourth Amendment, not Rouei's other claims. *See* Defs.' Mem. in Support of Mot. for Summ. J. at 13-14; Defs.' Reply at 1-6 (both discussing only whether Groberski had an appropriate basis under the Fourth Amendment to stop and arrest Rouei).

Qualified immunity is an affirmative defense that protects government officials from liability for civil damages. *See, e.g., Gibbs v. Lomas*, No. 13–3121, 2014 WL 2736066, at *5 (7th Cir. Jun. 17, 2014). To determine whether a government officer is entitled to qualified immunity, a court asks "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir.2013). On the second point, a plaintiff typically must show that it is "sufficiently clear that a reasonable official would understand that what he is doing violates [the] right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Defendants maintain that Rouei has not made out any constitutional violations. Defs.' Reply at 2-3. But the Court has already found that the evidence in this case,

18

when viewed in the light most favorable to Rouei as required for present purposes, would permit a reasonable jury to find that his Fourth Amendment (as well as his equal protection and due process) rights were violated. The same genuine factual disputes regarding the underlying events that preclude entry of summary judgment in Groberski's favor on liability likewise preclude entry of summary judgment in his favor based on qualified immunity. With regard to the Fourth Amendment claim in particular, qualified immunity exists in a false arrest case where there is "arguable" probable cause, *see, e.g., Huff*, 744 F.3d at 1007, and thus it likely exists in a false *Terry* stop case where there is "arguable" reasonable suspicion. But if, among other things, Groberski could not actually see whether Rouei was wearing a seatbelt—as the Court has concluded a reasonable jury could find—there was no "arguable" reasonable suspicion just as there was no actual reasonable suspicion.

In his opening brief, Groberski did not argue the second part of the qualified immunity test. Specifically, he did not argue that the governing constitutional standard was not clearly established. *See* Defs.' Mem. in Support of Mot. for Summ. J. at 13-14. In his reply, Groberski argued (for the first time) that under Illinois law as it existed at the time, it was appropriate for him to request identification and proof of insurance from Rouei even if the original basis for the stop had dissipated. *See* Defs.' Reply at 3-4. This appears to be an argument that the law upon which Rouei relies was not clearly established. An argument made for the first time in a reply brief, however, is forfeited. *See, e.g., Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014). In any event, this argument does not address the entirety of Rouei's Fourth Amendment claim, in which he alleges the impropriety of the stop from its inception. Thus even were Groberski's

belated argument properly considered, it would not warrant granting summary judgment in his favor on the Fourth Amendment claim.

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of defendant Village of Skokie on Count 1 of the complaint, plaintiff's equal protection claim, but otherwise denies defendants' motion for summary judgment [docket no. 32]. On the Court's motion, the Clerk is directed to correct the name of the second defendant from "Officer Groberski" to Jeffrey Groberski and is also directed to correct the caption of the case accordingly. The case is set for a status hearing on August 5, 2014 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                           United States District Judge
```

Date: July 28, 2014